UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICIA A. KIENZLE,

                       Plaintiff,                            Case Number 11-11930

v.                                                Honorable David M. Lawson

GENERAL MOTORS, LLC,

                       Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      This matter is before the Court on the defendant's motion for summary judgment. Plaintiff

Patricia Kienzle alleges in a complaint filed in this Court that from July 2009 to January 2010,

defendant General Motors LLC (GM) paid Kienzle less money for doing the same work as male

supervisors and the male engineers that she managed. In an amended complaint, she also alleges

that male supervisors she worked with harassed her, that managers and company human resources

representative ignored her complaints of harassment, and that managers retaliated against her when

she complained. Kienzle bases her complaints of discrimination and retaliation on Title VII of the

Civil Rights Act of 1964, Michigan's counterpart legislation, and the Equal Pay Act. The Court

heard oral argument on the defendant's motion on October 25, 2012 and now concludes that the

plaintiff has offered sufficient evidence on her Equal Pay Act and disparate treatment claims to

survive summary judgment, but she has failed to do so on her retaliation claims. Therefore, the

Court will grant in part and deny in part the defendant's motion for summary judgment.

I.

Kienzle is a current employee of GM.  She began working in a salaried full-time position for the former General Motors Corporation (now known as Motors Liquidation Company) at its Ypsilanti, Michigan facility in 1983.  Kienzle worked in a variety of positions throughout her tenure with GM, receiving numerous promotions that gradually elevated her from a level three position to level eight.  GM apparently uses a flexible salary structure to denote job responsibilities and related pay ranges.  Salaried employees are assigned a level of responsibility, ranging from level two through level nine.  Kienzle has been classified by GM as a salaried exempt employee since 1985.

Kienzle transferred in 2008 to the Pontiac, Michigan facility when GM decided to close its plant in Ypsilanti.  Since July 2010, Kienzle has worked in the Customer Care department.  Before July 2010, Kienzle worked as an Engineering Group Manager in the Powertrain division, supervising a small team of engineers who ran transmission dynamometer cells to support engineering development work.  The team kept the cells running twenty-four hours a day, seven days a week, to provide data for development engineers on how well their transmission designs worked.

The plaintiff's claims are fact-intensive, which requires the Court to discuss the record in detail.

## A. Hour/pay disparity claim

As noted above, Kienzle alleges that when she worked in the Powertrain division from July 2009 to January 2010, GM paid her less money for doing the same work as male counterparts.  She asserts that as a "flex-time" employee, she had a salary based on a 32-hour work week and was not allowed to receive overtime pay for any extra hours that she worked.  But despite the nominal cap on her work hours, Kienzle's managers at GM expected her to work 40 or more hours per week,

which she often did, and they delayed for seven months her requests to be upgraded to full-time status to reflect her actual workload.  In contrast, she says, the male engineers who worked for Kienzle, and several male supervisors, were all  full-time employees and eligible for overtime pay on any extra hours that they worked.

In 1997, Kienzle chose to begin working a flexible service schedule pursuant to GM's Flexible Service policy, and she remained a flexible service employee until 2010.  GM's Flexible Service program is a part-time work option for salaried employees.  Flexible Service employees are not eligible for overtime, may not work more than forty hours per week, and are "not . . . permitted to work on Saturday or Sunday, unless these days are part of their regular workweek schedule." Def.'s Mot. for Summ. J., Ex. A, Kienzle dep., Ex. 2, GM Flexible Service and Special Flexible Service Administrative Guidelines at 4.  From 1997 to 2009, Kienzle shared the responsibilities of her position with Colleen Diemer, another flexible service employee, each working 24 hours per week.  GM's Flexible Service policy provides that "[t]here may be times when employees in Flexible Service . . . employment categories exceed their regular workweek schedule in order to accommodate either leadership or the employee." *Ibid.*  GM's Flexible Service policy specifically provides that "[l]eadership is under no obligation to place flexible service employees into regular full-time positions." *Id.* at 3.

When Kienzle worked at GM's Ypsilanti facility, she was working as an engineering group manager (EGM) in the transmission validation group of GM's Powertrain organization.  The validation group is generally responsible for providing engineering support for the testing of transmission products in dynamometer cells within a laboratory setting and testing conducted on vehicle proving grounds.  In an effort to consolidate its engineering activities within Powertrain, GM

relocated the five product areas that make up the organization — including the transmission engineering group in which plaintiff worked — to its Pontiac facility.

General Motors Corporation underwent a company-wide restructuring in 2008 and 2009 as a result of management decisions that eventually forced the company into bankruptcy. General Motors Corporation took that opportunity to eliminate thousands of salaried positions from its U.S. workforce, affecting nearly every organization within GM, including Powertrain.

As a result of the restructuring, the validation manager position shared by plaintiff and Diemer in Powertrain transmission engineering division was reduced from an eighth-level position to a seventh-level position effective May 1, 2009. Kienzle previously reported to the Executive Director of Transmission, Jeff Baran, but because of the consolidation within that group, she began reporting to Dave Stark, who assumed the managerial responsibilities of the transmission group's validation and road-to-lab-to-math activities. As a result, Kienzle and Diemer supervised more people and took on the responsibilities formerly held by Mark Farone and Bob Conn.

Other eighth-level managerial positions under Baran's supervision within the transmission group were similarly adjusted downward in May 2009. The only other position that also included responsibility for managing validation activities was held by Mark Farone. Farone was a validation supervisor in Milford prior to the reorganization, but his position was eliminated and his supervisory duties passed to Kienzle and Diemer. The Pontiac and Milford validation groups were combined into one group, with Kienzle and Diemer sharing responsibility for managing it. Prior to the reorganization, Farone was an eighth level full-time employee. He was reduced to level seven. Bob Conn's position as manager of dynamometer hardware was also reduced from eight to seven.

The only eighth level manager that remained after the reorganization was Michael Partridge. Partridge was brought into the Powertrain organization, reporting to Dave Stark just as Kienzle did. Partridge and Kienzle both managed teams of engineers. When Partridge left the validation group, Dan Wehrein came in to replace him. Wehrein was a full-time seventh level employee. Angela Willis testified that Partridge's job was equivalent to Kienzle's: "The Engineering Group Manager RLM (Road to Lab to Math) position would have been an equivalent position to Pat's Validation Manager (then General Supervisor) position for the entire time that those positions existed. Pat's effort, skill, and responsibility as Validation Supervisor were the same as the EGM RLM." Pl.'s Resp. to Mot. for Summ. J., Ex. 6, Willis aff. ¶¶ 18-19.

Before Kienzle's position was reduced to level seven and burdened with additional responsibilities, Kienzle was given the option to return to full time, but she declined. Instead, she and Diemer chose to increase their flexible service schedules from 24 hours to 32 hours per week. Effective May 16, 2009, Kienzle's annual base salary was increased by more than 30 percent to $100,608 as a result of the increase in hours. Approximately two months later in July 2009, Kienzle talked to Stark about returning to full time status, but he had not checked with the human resources department to see if that was an actual option.

Following the restructuring, Kienzle and Diemer chose to end their job sharing arrangement and divided the transmission validation responsibilities between the two of them, with Diemer taking on a greater portion of the new responsibilities recently shifted to the position. As a result, Kienzle had fewer engineers reporting directly to her than before.

Kienzle says she managed a group of seven engineers. The engineers who reported to her in 2009 were male and worked in full-time exempt positions. Kienzle described her supervisory

position as different from the job of her direct reports in that she had more responsibility to the organization by representing her team in meetings and handling the planning and business functions for the group, whereas the engineers were assigned to a specific product team and provided technical engineering oversight for validation tests.   The men who reported to Kienzle following the May 2009 restructuring all held engineering degrees, but Kienzle did not. GM apparently does not require that a person hold an engineering degree in order to be classified as an engineer.   At one point Kienzle herself worked as an assistant staff engineer.

After the reorganization, Kienzle's supervisor job was a seventh level position, the same as those of the engineers that she managed.   Bruce VanVliet and Paul Trybula, two members of Kienzle's team, testified that Kienzle covered the job duties of her engineers when they were out, and that she had all of the skills and knowledge needed to do so.  VanVliet stated: "Pat operated at a level higher than the engineers which she supervised in her technical knowledge and skills.  She would have been able to step in and do the job of the Validation Engineers in their absence or when back-filling for them.   When a Validation Engineer was absent, Pat easily assumed the responsibilities and duties.  In fact she excelled in them."  Pl.'s Resp. to Mot. for Summ. J., Ex. 8, VanVliet aff. ¶ 13.   Trybula agreed: "When Pat covered for me she easily filled in with the same skill, effort, and responsibility that I had.  This happened every time I went on vacation.  Pat was able to cover for me with the direction and information I left for her.  When Pat was called by the lab technicians with questions regarding my cells and pallets, she had the same tasks as I and the other engineers and was able to complete them without difficulty."  Pl.'s Resp. to Mot. for Summ. J. Ex. 7, Trybula aff. ¶¶ 9-10.

In June 2009, General Motors Corporation filed for Chapter 11 bankruptcy protection. As part of the bankruptcy reorganization, certain assets were sold to General Motors Company, the entity now known and reorganized as General Motors LLC. Under that arrangement, Kienzle remained employed by General Motors Corporation until July 10, 2009, at which time she became an employee of defendant General Motors LLC.

In August 2009, the transmission validation group began an effort to provide twenty-four/seven engineering support for some of the laboratory work. That initiative required the validation group to develop procedures to troubleshoot problems with the transmissions when dynamometer cells stopped running during off-shifts. One of the procedures used to support the laboratory's twenty-four/seven operation was a call tree, which directed the laboratory to contact certain validation engineers when issues arose on evenings or weekends. Kienzle was placed on one of the early versions of the call tree, although GM asserts that she lacked the technical skills to make a product decision and would only be contacted as a courtesy if an engineer failed to respond or in the rare circumstance that an issue needed to be escalated to a supervisor. However, Kienzle asserts that she responded to calls from the lab "with the same skill, attention and ability as her engineers did," Pl.'s Resp. to Mot. for Summ. J. at 2 (citing Resp., Ex. 6, Willis aff. ¶ 13) and that she was required to answer calls and return messages on evenings and weekends. As the validation group continued to develop processes for providing twenty-four/seven engineering support, a technical specialist eventually was placed on second shift to address any significant disruption in the testing and product development activities with the laboratory.

In late August 2009, Kienzle and the engineers whom she supervised were asked to work a weekend to assist with the launch of the 24/7 initiative. Kienzle did not receive overtime pay for

the weekend.  Unlike Kienzle, the engineers she supervised were full-time employees and were eligible and approved for overtime for the special project.  GM asserts that although the engineers were occasionally approved for overtime related to their roles for the twenty-four/seven plan, such approved overtime was minimal. Apart from the overtime associated with the pilot project in August 2009, only 12 hours of total overtime was approved in Kienzle's group from September 2009 until she became full time in January 2010.  Kienzle admits there might have been  instances in which the validation engineers worked unpaid overtime in supporting the twenty-four/seven efforts, and Stark testified to as much.  Because Kienzle was not eligible for overtime as a flexible service employee, her manager allowed her to take off one day in exchange for her time worked on Saturday.

Stark acknowledged that he knew Kienzle was working more than her 32 scheduled flex service hours per week, but he never told her not to work those extra hours nor did anything to re-allocate the work to change the number of hours that she was working.

In August 2009, Kienzle sent an email to the Human Resources department about changes in the laboratory that were going to require more hours to be worked, and she asked if it was possible for a flexible service employee to get paid for overtime.  Kienzle was advised that pursuant to GM policy, flexible service employees are not eligible for overtime.  Although many GM salaried employees in exempt positions frequently work more than their regularly scheduled hours each week and are not paid for what is known as "casual" overtime, full-time exempt employees can be compensated for overtime in limited situations subject to management approval.

Mike Coutts became Kienzle's manager in October 2009, and around that time she asked Coutts if she could convert to full-time status.  Coutts understood that Baran was aware already that Kienzle wanted to work full time.  On October 7, 2009, Kienzle sent Coutts an email asking to be

-8-

made a full-time employee as soon as possible.  Coutts forwarded the email to Baran.  Baran testified that he became aware in October 2009 that Kienzle wanted to be made full time, but because of "headcount" issues, that was not possible.  Fonda Dietz, a human resourses representative for Transmission Engineering, testified that the defendant's headcount is determined each month on an actual basis versus the target for the end of the year (which would have been December 31, 2009), and each department worked toward that number during the year.  Dietz said that throughout the year, the numbers do not usually match, and they are always fluid for a variety of reasons.  Dietz explained that no issue arose if a department was over the target during the year, as long as it had a plan to reach the target by the end of the year.

After consulting with HR and other management, Coutts and HR advised Kienzle that a full time position was not a viable option at that time because of staffing and headcount limitations resulting from budgetary constraints.

Kienzle also informed Coutts that she had been working numerous hours beyond her 32-hour workweek, and in January 2010, he instructed her to go home after working 32 hours, although she believed Coutts said that in frustration.  Coutts testified that he did not respond to Kienzle's emails requesting conversion to full-time employment, but took plaintiff into a conference room after the emails she sent on October 7 and November 5 and told her to go home and that he would finish the work she could not do.   He did not tell her who would take over her work when she left, that she would be taken off the call tree when she left, or how her work would get finished when she left.  However, Kienzle admits that Coutts did not threaten to discipline her if she chose to go home after working 32 hours.

In December 2009, Andrea Hidalgo was hired into the validation group and placed under Kienzle's supervision before Kienzle received her full-time designation, which occurred in January 2010. In addition to a salary increase reflecting Kienzle's change to full-time status, GM awarded her a $7,300 bonus in February 2010.

### B. Sex harassment and retaliation complaints

Kienzle alleges that Steve Nash and Bill Lychuck, two employees she interfaced with in the lab on a daily basis, discriminated against her because she is a woman. She bases her claim on the following evidence.

In August 2009, Kienzle presented Stark with a list of issues relating to work tasks she believed the laboratory was not addressing in a timely fashion, as well as instances in which Bill Lychuck, a manager in the laboratory, was supposedly disrespectful of her and her group. The laboratory at the Powertrain division supports product development and engineering within the different groups that make up that division, including the transmission and engine groups. Kienzle expressed her belief that laboratory management treated the transmission validation team as a "nuisance" and favored the engine group over the transmission group. Kienzle and Stark also discussed an instance in which Kienzle was speaking with Lychuck about the laboratory's priorities, and Lychuck stated that "these conversations kill me." Pl.'s Resp. to Mot. for Summ. J., Ex. 5, Stark dep. at 66-67. In another conversation, Kienzle testified that Lychuck degraded her for being a female supervisor of the transmission organization.

Stark arranged a meeting with Kienzle and Baran to discuss her concerns. Kienzle repeated the items she had relayed to Stark and also reported that she had been told that Steve Nash, another laboratory manager, stated to Stark that "I got rid of my problem, now you get rid of yours," which

-10-

she believed to be a threat toward her job. Pl.'s Resp. to Mot. for Summ. J., Ex. 1, Kienzle dep. at 142, 146-48, 159.  Stark explained that the comment was not about getting rid of Kienzle, but rather it was made by Nash during a conversation with Stark in which he was expressing frustration that she was giving work assignments directly to his staff in the laboratory without first going through him.  Kienzle described Nash as argumentative toward her initiatives, and said that she heard he told another supervisor "We're going to show her." *Id.* at 143-44.

Kienzle also reported that Nash instructed her to tape her list of priorities to the wall, but believes he did not instruct the supervisors in the engine group to do the same.  Kienzle said that Nash told her that the transmission team was his biggest problem in keeping the cells running, and told another supervisor that "Those two won't be going to the prom any time soon," in reference to Kienzle and Lychuck. *Id.* at 155.  Kienzle believed that laboratory managers were critical of her and her group, and stated that Lychuck said "Shame on you," and referred to her as "narrow-minded" when discussing how she delegated work to her team. *Id.* at 157, 261.  Kienzle also asserted that Lychuck had set up a meeting with her, and then later told her that he did not have time to meet with her.

Following her meeting with Baran and Stark, Kienzle also reported her concerns to Fonda Dietz in the human resources department.  Dietz and Baran discussed Kienzle's complaints and concluded that they stemmed from business-related issues that could best be resolved by working to improve communications between the two groups.  Baran and Stark then met with the director of the laboratory organization, Roger Dugay, and Lychuck to address Kienzle's concerns.  During this meeting, Baran and Stark agreed to work on a plan with Lychuck to improve communication and work output between Kienzle's group and the lab.

When Coutts became Kienzle's manager, she expressed to him that the laboratory folks were not listening to her and that other groups were getting more support than the transmission team received.  Other employees on the transmission team also complained to Coutts about prioritization of work in the laboratory, with specific complaints that the engine group was benefitting from more resources than the transmission team.  Coutts talked to Nash, Lychuck, and other managers in the laboratory about some of the issues raised by transmission employees, including Kienzle, and Coutts believed that Kienzle and others within the transmission team were making demands of a lesser priority than demands made by other product groups, particularly the engine group.

Kienzle concedes that she never asserted that her difficulties with laboratory personnel were related to her gender.  It appears that management and human resources personnel believed that Kienzle's issues involved business-related difficulties in coordinating work between two groups that were significantly impacted by the restructuring of the Powertrain organization.  Additionally, the engine group was newer to the Pontiac site and was facing more obstacles in getting its product cells running; thus, resources were being pulled from the transmission group and allocated to the engine group, causing discontent among the transmission staff.

In January 2010, Kienzle informed Baran and Coutts that she wished to find a new position with GM because she did not feel she was getting the support she needed in her current position.  Employees are required to notify their supervisor before they can apply for an internal position within GM.  During that conversation, Kienzle told Baran about her excessive work hours and how there had been no resolution to the harassment she told him about in August 2009.

Kienzle set up a meeting with Baran's superior, Jim Lanzon in April 2010, to discuss her difference in pay.  Kienzle met with Lanzon and told him about hours she had worked over her flex

service schedule, and Lanzon asked her to go back and put together a list of the hours she had worked. Lanzon suggested that Kienzle meet with Andrea Ebbitt, Director of the human resources department for Global Manufacturing Engineering, about her harassment complaint. During the ensuing meeting with Ebbitt, Kienzle detailed both the many hours she worked over her flex service pay and the harassment she had endured. Ebbitt never followed up with Kienzle after that meeting or confirmed that anyone in the human resources department had done so.

Kienzle believes Baran should have done more to help her find a new job. However, Baran notified Kienzle of at least two potential internal opportunities, and she chose not to apply for either position. Baran also placed a call to another GM manager to explore potential opportunities for Kienzle and to personally recommend her, something he says he has never done for any other employee.

Kienzle applied for and accepted a lateral position in the Transmission Service & Remanufacturing Engineering group at Pontiac in July 2010. She remained a seventh level employee and her pay was not affected by the transfer. After Kienzle transferred, her former validation supervisor position was posted internally and candidates were required to apply and interview. Jason Solomon, one of the engineers who formerly reported to Kienzle, was selected for the position. Although Kienzle had already been reclassified to full-time at the time she transferred, her flexible service reduced salary was actually higher than Mr. Solomon's full-time salary even after he was promoted to her former position.

## C. Procedural history

Kienzle filed a complaint with the EEOC on August 3, 2010, and thereafter filed her complaint against GM in this Court on May 2, 2011, alleging a violation of the Equal Pay Act. The

EEOC issued a right-to-sue letter on June 23, 2011, and the plaintiff filed an amended complaint on

August 11, 2011 alleging a violation of the Equal Pay Act, (count I); sex discrimination under Title

VII of the Civil Rights Act of 1964 (count II); retaliation under Title VII (also labeled as count II);

sex discrimination under Michigan's Elliott-Larsen Civil Rights Act (count III); and retaliation

under Michigan's Elliott-Larsen Civil Rights Act (count IV). Discovery closed on March 16, 2012.

The defendant filed its motion for summary judgment attacking all counts of the amended complaint.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

As the Sixth Circuit has explained:

> Both claimants and parties defending against a claim may move for summary
> judgment "with or without supporting affidavits." Fed.R.Civ.P. 56(a), (b). Such a
> motion presumes the absence of a genuine issue of material fact for trial. The court
> must view the evidence and draw all reasonable inferences in favor of the
> non-moving party, and determine "whether the evidence presents a sufficient
> disagreement to require submission to a jury or whether it is so one-sided that one
> party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
> 242, 251-52 (1986).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

"The party bringing the summary judgment motion has the initial burden of informing the

district court of the basis for its motion and identifying portions of the record that demonstrate the

absence of a genuine dispute over material facts." 576 F.3d at 558. (citing *Mt. Lebanon Personal*

*Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs,

the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the

movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in

order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.' " *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." 350 F.3d at 546 (quoting 477 U.S. at 252) (internal quotation marks omitted).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th

-15-

Cir. 2000).  Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

### A.  Equal Pay Act claim

GM argues that Kienzle cannot make out a *prima facie* case under the Equal Pay Act, 29 U.S.C. § 206(d)(1), because the plain language of the statute applies only to differences in the hourly rate of pay, not the number of hours worked.  For that proposition, GM relies on *Lauper v. Central Parking System*, 708 F.2d 725 (6th Cir. 1982) (Table), an unpublished decision.  *Lauper*, however, is off point because it — like the other noncontrolling cases GM cites — concerns only the denial of the opportunity to take overtime work, not the failure to pay regular or overtime wages for hours actually worked in excess of an employee's regular schedule, or in excess of the statutory 40-hour-per-week limit.  Nonetheless, GM believes that because Kienzle does not challenge the hourly rate of her pay, she cannot satisfy the first element of a claim under the Equal Pay Act.  The Court disagrees.

The Equal Pay Act prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work.  29 U.S.C. § 206(d)(1).  The statute reads:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

-16-

*Ibid.*  In order to establish a *prima facie* case of wage discrimination under the EPA, the plaintiff must show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)).

The regulations that relate to the EPA make clear that the statutory term "rate" in the statute refers to any relevant base against which a wage is paid, whether by the hour, day, month, annually, or by piece work or some other measure:

> The term wage "rate," as used in the EPA, refers to the standard or measure by which an employee's wage is determined and is considered to encompass all rates of wages whether calculated on a time, commission, piece, job incentive, profit sharing, bonus, or other basis. The term includes the rate at which overtime compensation or other special remuneration is paid as well as the rate at which straight time compensation for ordinary work is paid. It further includes the rate at which a draw, advance, or guarantee is paid against a commission settlement.

29 C.F.R. 1620.12(a).  The statutory term "wages" means *all* forms of payment or compensation, including holiday, vacation, or overtime pay, as well as any other benefits or payments not included under other statutes as part of regular wages:

> Under the EPA, the term "wages" generally includes all payments made to [or on behalf of] an employee as remuneration for employment.  The term includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name. Fringe benefits are deemed to be remuneration for employment. . . . Thus, vacation and holiday pay, and premium payments for work on Saturdays, Sundays, holidays, regular days of rest or other days or hours in excess or outside of the employee's regular days or hours of work are deemed remuneration for employment and therefore wage payments that must be considered in applying the EPA, even though not a part of the employee's "regular rate."

-17-

29 C.F.R. 1620.10.  The plaintiff can establish a violation of the Act if she establishes that the defendant paid her less compensation — however measured — than male counterparts for the same work.

Contrary to GM's argument, the "plain language" of the EPA nowhere suggests that its reach ends at a strict comparison of hourly rates of pay.  The regulations issued under the statute make clear that the term "wage" used in the statute includes all forms of pay and compensation, given in whatever form or fashion, and that the term "rate" means any relevant scale on which wages are paid.  In fact the "plain language" of 29 U.S.C. § 206(d)(1) does not include the words "hour," "hourly" or any similar chronological term.

GM also argues that even if Kienzle could make out a claim of unequal rates of pay, her Equal Pay Act claims still must fail because she cannot show that she and the validation engineers who reported to her did equal work.  GM reasons that because Kienzle did not have an engineering degree or the skill and knowledge to do engineering work, she cannot show that she did the same work as the engineers whom she supervised.  However, "[j]obs need not be identical in order to be considered 'equal work' under the EPA."  *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006). "Whether a job is substantially equal for purposes of the EPA is determined on a case-by-case basis and 'resolved by an overall comparison of the work, not its individual segments.'" *Id.* at 359-60.  When comparing jobs for the purpose of an EPA claim, the focus is on actual job requirements and duties, rather than job classifications or titles.  *Id.* at 362.  "Because the comparison at the prima facie stage is of the jobs and not the employees, only the skills and qualifications actually needed to perform the jobs are considered."  *Id.* at 363.  "Factors like

-18-

education and experience are considered as a defense to an employer's liability rather than as part of a plaintiff's prima facie case." *Ibid.*

The Court believes that a jury reasonably could conclude that GM paid Kienzle less than her male peers. As GM points out, Kienzle offers nothing to show in dollar terms the wages paid to the male validation engineers who worked for her, or to anyone else other than herself and her successor in the supervisor job. And in the case of her successor, the undisputed facts show that he started at a lower nominal salary as a full-time employee compared with the salary Kienzle had in the same job while paid on a part-time basis. However, GM does not dispute that Kienzle's salary was discounted based on her part-time status; indeed GM points out that when Kienzle was upgraded from 24 hours per week to 32 hours per week she received a proportional 33% raise. If GM paid Kienzle less because she was classified as part-time than it would have had she been full-time, that suffices to show a pay disparity, even if her net salary in dollar terms was higher than some other employees paid on a full-time basis.

*Buntin v. Breathitt County Board of Education*, 134 F.3d 796 (6th Cir. 1998), illustrates the point. In that case, the court found that the plaintiff had established a *prima facie* case under the EPA where she showed that a school district imposed a lower annual *pro rata* salary cap on her compared with the cap applied to her male predecessor. District administrators had their salaries scaled or capped based on the number of "extended service days" per year that varied according to how each position was rated. The plaintiff was hired with a 220-day cap, but her predecessor had been subject to a 240-day cap, and received a 10% bonus as well. The court did not discuss the dollar figures that the salary formula produced, but treated the lower *pro rata* cap as evidence in itself of a pay gap. That holding is consistent with the broad language of the regulations that define

"wage" and "rate," which dictate that an employer must pay equal wages with regard to any relevant "rate" or basis that applies.

Kienzle has presented evidence showing the "level" and the part-time or full-time classification of her male peers. Before the "releveling" in the Powertrain division, Mark Farone was a full-time eighth level supervisor in Milford (doing the same job there that Kienzle and Diemer job-shared as eighth level supervisors in Pontiac). Michael Partridge was a full-time eighth level manager in the validation group after the reorganization, in contrast with Kienzle's part-time seventh level position. Like Kienzle, Partidge also managed a small team of engineers. Partridge's successor, Wehrein, was a full-time seventh level manager. Finally, the engineers who worked for Kienzle were all full-time, seventh level engineers, while Kienzle was only a part-time seventh level supervisor. Assuming that "level" at least partly dictates the range of salary paid to employees at GM, Kienzle has shown that as a seventh level manager subjected to a part-time salary discount, she was paid less than male peers in seventh level jobs who were compensated on a full-time basis.

GM objects that Kienzle cannot compare her salary to full-time peers because she was not similarly situated with them based on her flexible service status. But that is no answer; it merely restates the charge: GM paid Kienzle less *because* it subjected her to a part-time salary proration while demanding that she work full-time hours. The case law is thin on the issue whether a nominally "part-time" employee can compare her compensation to "full-time" peers in order to show a disparity under the EPA. GM cites only a handful of noncontrolling, unpublished, and unhelpful cases. Kienzle cites none. However, following the principle in *Buntin*, the Court believes that a jury may decide whether GM in fact paid Kienzle less than her male peers by imposing the "salary discount" that went along with the flexible service classification, while still requiring Kienzle to

-20-

work full-time hours. At least one district court has done just that. "[W]here . . . the plaintiff is required to work three quarters of the hours worked by the putative comparator and in fact on occasion works more, and where the plaintiff's actual tasks, duties, and responsibilities are essentially similar to those of the putative comparator, then the issue becomes one of fact for the jury to resolve." *Lovell v. BBNT Solutions, LLC*, 295 F. Supp. 2d 611, 619 (E.D. Va. 2003).

GM's argument that Kienzle proves she was not similarly situated by showing that she had *more* responsibility than the engineers who reported to her contradicts the Sixth Circuit's express holding in *Beck-Wilson*. The defendant cannot distinguish two jobs for the purposes of the EPA by showing that a lower paid job requires higher skill and responsibility. "While 'differences in skill, effort, or responsibility . . . might be sufficient to justify a finding that two jobs are not equal . . . if the greater skill, effort, or responsibility has been required of the higher paid sex, [such differences] do not justify such a finding where the greater skill, effort, or responsibility is required of the lower paid sex.' " *Beck-Wilson*, 441 F.3d at 360 (quoting 29 C.F.R. § 1620.14(a)). As the Sixth Circuit explained, it defies reason and logic to suggest that an employer may defend a case of wage discrimination under the EPA by proving that a woman works *more* but is paid *less* than her male peers.

A jury reasonably could conclude that GM paid Kienzle less because of her sex, if the part-time classification does not in itself justify the pay gap, and if the jury rejects GM's argument that the need to control headcount justified the gap. Proof of discriminatory intent is not required to establish a *prima facie* case under the Equal Pay Act. *Beck-Wilson*, 441 F.3d at 360. If the plaintiff establishes a *prima facie* case, then the defendant must prove that the wage differential is justified under one of the four affirmative defenses set forth under section 206(d)(1) of the Equal Pay Act:

-21-

(1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality of production; or (4) any other factor other than sex. *Buntin*, 134 F.3d at 799 (citing *Corning Glass Works*, 417 U.S. at 196). Because those are affirmative defenses, the defendant must do more than simply suggest a nondiscriminatory reason for the differential, and the defendant, not the plaintiff, must carry the burden of persuasion. *Beck-Wilson*, 441 F.3d at 360.

GM bears the burden of proving one of the four affirmative defenses under the law, and it offers only one — the need to control headcount in the Powertrain division due to the dire economic circumstances of the company during and after the 2009 bankruptcy. GM does not even suggest that seniority, merit, or any form of quota accounts for the pay gap. The Equal Pay Act's exception that a factor other than sex can be an affirmative defense "does not include literally any other factor, but a factor that, at a minimum, was adopted for a legitimate business reason." *EEOC v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1988) (quotation omitted). "[T]he burden of proving that a factor other than sex is the basis for a wage differential is a heavy one." *Brennan v. Owensboro-Daviess County Hospital*, 523 F.2d 1013, 1031 (6th Cir. 1975). "[U]nless the factor of sex provides no part of the basis for the wage differential, the requirements [for the defense] are not met." *Ibid.* (quotation omitted). The EPA plaintiff need not provide evidence of "pretext" to rebut the employer's stated justification, and the employer moving for summary judgment must show that there is no genuine issue as to whether the difference in pay is due to a factor other than sex. *Beck-Wilson*, 441 F.3d at 365.

Kienzle's flexible time classification does not justify the disparity. According to the plaintiff, that classification is the means of imposing the disparity, not an excuse for the imposition. A fact question remains on the issue whether GM's delay in converting Kienzle to full-time status

following her several requests was justified by economic pressures. GM points out that it offered to convert Kienzle to full-time in May 2009, during the "releveling" process that converted her position from eighth to seventh level. A jury reasonably could conclude that if GM was willing to convert Kienzle to full-time status in May, it has not shown why it could not do so just as well in July or August, when Kienzle changed her mind and asked to be upgraded when she realized that she was called on to do full-time work anyway. If Powertrain was under "intense scrutiny" to meet headcount figures in July and August, when the company had cleared the process of bankruptcy, then it is unclear why that scrutiny was any less earlier in May.

GM also disputes that an employee was hired into Kienzle's group prior to her conversion, but Coutts testified that Andrea Hidalgo was hired into the validation group and placed under Kienzle's management while Kienzle was still in a part-time status. The jury must decide which side to believe on that point.

Finally, Kienzle points out that GM elected to pay overtime to her engineers during the 24/7 launch weekend, even though company policy did not require overtime approval for full-time exempt salaried employees who worked extra hours.

When viewing the evidence in the light most favorable to the plaintiff, the Court must conclude that the plaintiff's case withstands summary judgment on the Equal Pay Act count.

### B. Title VII & Elliott-Larsen disparate treatment claims

Title VII makes it unlawful for an employer "to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Michigan Elliott-Larsen Civil Rights Act forbids like conduct.

Claims of gender discrimination under Title VII and the Michigan counterpart can be analyzed together because Michigan courts frequently "turn to federal precedent for guidance in reaching [their] decision" to determine whether a claim has been established in discrimination cases. *Radtke v. Everett*, 442 Mich. 368, 382, 501 N.W.2d 155, 162 (1993) (quoting *Sumner v. Goodyear Co.*, 427 Mich. 505, 525, 398 N.W.2d 368 (1986)). For analytical purposes, Michigan's Elliott-Larsen Act resembles federal law, and the same evidentiary burdens prevail as in Title VII cases. *See In re Rodriguez*, 487 F.3d 1001, 1008 n.2 (6th Cir. 2007); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Lytle v. Malady*, 458 Mich. 153, 172-73, 579 N.W.2d 906, 914 (1998).

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). To withstand summary judgment on her disparate treatment claim, the plaintiffs must either "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003).

The plaintiff does not contend that she has direct evidence that her pay disparity was due to her gender. In the absence of direct evidence, the plaintiff might prevail if she can establish an inferential case of discrimination under "the burden-shifting framework first set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-05 (1973)." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007) (citing *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004); *Town v. Mich. Bell Tel. Co.*, 455 Mich. 688, 695, 568 N.W.2d 64, 67-68 (1997)). That construct requires the plaintiff to present a *prima facie* case, whereupon the defendant must offer a legitimate reason for its actions. If the defendant does so, the plaintiff cannot proceed unless she

-24-

offers some evidence that the defendant's proffered justification is a pretext for unlawful discrimination. *See Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 342 (6th Cir.1997).

A plaintiff may establish a *prima facie* case of discrimination "by showing that: '(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was . . . treated differently than similarly situated non-protected employees.'" *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (internal citations omitted). Deprivation of increased compensation qualifies as an adverse employment action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 403 (6th Cir. 2008).

GM argues that Kienzle cannot establish a *prima facie* case of discrimination because she has failed to show that any male employee, similar to her in all relevant aspects, received more favorable treatment. GM asserts that Kienzle has not shown that any male employee was upgraded to full-time hours as a result of working consistently more hours than their flex-time schedule, or that any male employee received extra pay or overtime for hours worked beyond their flex-time schedule. Although Kienzle alleges she received less favorable treatment than engineers working for her, GM contends that she cannot show they were equally situated, because they were full-time employees and she was not. The record shows that no flex-time employees were eligible for overtime, and that full-time employees were. Kienzle also admits that she performed different work as a supervisor than the male engineers whom she supervised.

However, for the reasons discussed earlier, the Court finds that the plaintiff has shown that she was treated differently than other seventh level managers, including Partidge and Wehrein, who were permitted full-time status while the plaintiff was not. Viewing the evidence most favorably to her, a jury could conclude that the plaintiff, a woman, was required to work the same hours as her

-25-

similarly-situated male counterparts from July 2009 to January 2010, but she made less money because of her part-time status, which surely is adverse employment action. *See White*, 533 F.3d at 402. Those male counterparts held positions that were similar to the plaintiff's in all relevant respects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The plaintiff has made out a *prima facie* case.

GM next argues that Kienzle cannot refute the reasons GM has advanced to justify denying overtime pay to Kienzle and refusing to advance her from flex-time to full-time. GM says it set Kienzle's work schedule and hours based on budget limits and headcount needs, and the denial of overtime was based on established company policy. GM asserts that Kienzle refused a change from flex-time to full-time when it was offered just prior to the May 2009 restructuring, and when Kienzle made a later request to return to full-time status, it was granted in less than four months. Kienzle admits that she was not told to work any hours beyond her flex-time schedule and was not disciplined for working fewer hours than full-time employees.

It appears that the period of contention for the plaintiff's gender-pay discrimination claim is the six months or so between her request to migrate to full-time status and the company's acceding to that request. During that time, Kienzle says she worked as much as her full-time male counterparts, and the evidence tends to support her. She may establish that GM's stated reasons for the delay in status change is a "made up" reason intended to conceal intentional discrimination by showing that the employer's stated reason either (1) has no basis in fact, (2) was not the actual reason for the action, or (3) is insufficient to explain the employer's action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). The evidence undermining GM's stated reasons —

-26-

budget limits and headcount needs — is discussed above. The Court finds that a jury could believe that those reasons had no basis in fact and therefore were pretextual.

The Court cannot conclude, therefore, that the defendant is entitled to judgment as a matter of law on the plaintiff's disparate treatment claims under Title VII and the Elliott-Larsen Civil Rights Act.

## C. Retaliation claims

The plaintiff has not pleaded a claim for a hostile work environment in her amended complaint. However, she has alleged that the defendant retaliated against her when she complained about hostile treatment from her co-workers, and disparate treatment in the form of unequal pay.

Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the Act. 42 U.S.C. § 2000e-3(a). In order to make out a *prima facie* case of retaliation, the plaintiff must show that (1) she engaged in protected activity; (2) the defendant knew she exercised her rights; (3) the defendant took adverse employment action against the plaintiff; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Wasek v. Arrow Energy Services, Inc.*, 682 F.3d 463, 468-69 (6th Cir. 2012) (citing *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)).

At the outset, it perhaps bears noting that the plaintiff has not shown that she was subjected to a hostile work environment at GM. She cites six incidents in which she alleges that Lychuk and Nash harassed and degraded her: (1) while Kienzle was trying to provide feedback on questions Lychuk had asked, he stood over her in an intimidating way and said, "these conversations just kill

-27-

me"; (2) Nash told Kienzle that if she wanted to have work done for her group, she needed to write her requests down and tape them to the wall, but male managers were not told to do the same, even for simple requests like paper towel holders; (3) Lychuk yelled at and degraded her for being a female supervisor, and called into doubt her skills and abilities; (4) Nash told Kienzle to reformat and resubmit the same list of priorities three times, just to see it different ways each time; (5) work and information was withheld from Kienzle because of the way others saw Nash and Lychuk treat her; and (6) when Kienzle asked an employee of Nash's group a question, the employee went to Stark and berated her for giving his group "all kinds of work." Pl.'s Resp. to Mot. for Summ. J. at 14.

Lychuk's and Nash's rude behavior would not have created a hostile work environment that violated Title VII or Michigan law unless they treated the plaintiff poorly because of her sex. *Kalich v. AT&T Mobility*, LLC, 679 F.3d 464, 470 (6th Cir. 2012) (citing *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 765 (6th Cir. 2006)). It is plain that the plaintiff did not like how she was treated by Nash and Lychuk, and although the incidents describe rude conduct and perhaps demonstrated the poor interpersonal skills of the engineers GM hired, none of them, except possibly the third, are related to sex.

Moreover, the six incidents cited by the plaintiff did not show that Nash's and Lychuk's bad behavior was pervasive. Title VII prohibits workplace conditions "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations omitted). The plaintiff must establish that harassment was "ongoing," "commonplace," and "continuing." *See Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321,

333–34 (6th Cir. 2008).  But "conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris*, 510 U.S. at 21.  An objective observer would not so characterize the plaintiff's working conditions.

But that is beside the point.  If the plaintiff complained about a hostile work environment due to her sex, and GM retaliated against her for doing so, the company violated Title VII.  Under Title VII, there are two types of protected activity: (1) participation in a proceeding with the Equal Employment Opportunity Commission and (2) opposition to an apparent Title VII violation. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989).  Complaining about allegedly unlawful conduct to company management is classic opposition activity. *Wasek*, 682 F.3d at 469.  The plaintiff contends that she falls under the second category of protected activity.

The Court disagrees.  The plaintiff admits that she never told any of her supervisors or GM's human resources representatives that she was being mistreated because of her sex.  And because there was no objective indication of that, GM cannot be charged with that knowledge.  Absent that knowledge, the plaintiff cannot show that any adverse action visited upon her by GM was based on her opposition to a Title VII violation.

There is another problem with Kienzle's retaliation claim:  she has not offered evidence establishing adverse action by GM.  To determine what qualifies as an adverse action in employment-related retaliation claims, the Sixth Circuit applies the Title VII retaliation standard announced in *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53 (2006). *See Jordan v. City of Cleveland*, 464 F.3d 584, 594 (6th Cir. 2006).  The test employs an objective component.  "[A] plaintiff must show that a reasonable employee would have found the challenged

action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (internal quotation marks omitted). Kienzle has not offered enough evidence for a jury reasonably to conclude that GM subjected her to any adverse employment action in response to her complaints. The closest she comes is alleging that Baran asked Kienzle if she wanted to find another job within GM. Although Kienzle asserts that "she knew it would only get worse," that amounts to nothing more than her own speculation; it does not suffice to show that GM took action against her. The one unflattering performance review that Coutts admits writing does not amount to an adverse action, because Kienzle does not demonstrate that any consequences flowed from the review. Her transfer to the Customer Care department was by her own account voluntary, and she admits that she retained her existing salary and moved into a position at the same level she left. Although Kienzle asserts that her career is over, because she lacks future opportunities for promotion, she has not established that GM forced her to take the transfer to her new job, or that the conditions in her engineering job were so awful that a reasonable person would have felt compelled to transfer.

The defendant is entitled to judgment as a matter of law on the plaintiff's retaliation claims.


III.

The Court finds that the plaintiff has offered sufficient evidence on her Equal Pay Act and disparate treatment claims to warrant jury determination. Not so with her retaliation claims.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #19] is **GRANTED IN PART AND DENIED IN PART**.

-30-

It is further **ORDERED** that the plaintiff's claims of retaliation under Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act in the amended complaint are **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  October 29, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 29, 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL

---